UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELYSE G. DUMACH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 13 cv 4386 |
| v. | ) |
| | ) Judge Sharon Johnson Coleman |
| CAROLYN COLVIN, COMMISSIONER OF | ) |
| SOCIAL SECURITY ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Before the Court are cross-motions for summary judgment [9, 13] arising from the Commissioner of Social Security's decision to deny plaintiff Elyse G. Dumach's request for disability insurance benefits. Dumach asks the Court to reverse the Administrative Law Judge's ("ALJ") determination that she is not disabled and entitled to benefits, and remand for further proceedings. Defendant contends that the ALJ's decision should be affirmed. For the reasons stated herein, this Court affirms the decision of the ALJ.

**Background**

Dumach was born on April 23, 1954. (Administrative Record ("A.R.") at 128). As of the date of her first filed application on March 9, 2010, she has been at least 55 years old. Prior to December 2009, Dumach operated her own business as a qualitative research consultant in the field of market research. (A.R. at 289). Dumach filed an application for disability insurance benefits ("DIB") under §§ 216(1) and 223 of the Social Security Act and 42 U.S.C. §§ 416(l) and 423 on March 9, 2010, alleging a disability beginning December 16, 2009, due to a number of ailments. The application was initially denied on June 23, 2010. Her motion for reconsideration was denied on September 23, 2010. Dumach filed a request for a hearing with an ALJ. On October 31, 2011, ALJ

1

Allyn Brooks held a hearing in Evanston, Illinois. Dumach was present and represented by attorney Gregory Benker. On November 16, 2011, ALJ Brooks issued his decision denying Dumach's application. Dumach filed a timely request for review of the ALJ's decision before the Appeals Council. On April 9, 2013, the Appeals Council denied the request for review. The denial of review by the Appeals Council made ALJ Brooks' decision the final determination of the Commissioner. Pursuant to 42 U.S.C. § 405(g), Dumach filed the complaint for judicial review now before this Court.

*A. Relevant Medical History*

On December 16, 2009, Dumach sought treatment at the emergency room for an incident of acute vertigo. (A.R. at 251). Doctors noted no abnormalities in her tests except for a right basal ganglia hypodensity that doctors believed was due to an old infarct or possibly a developmental abnormality. (*Id.*) On March 3, 2010, Dumach went to the emergency room complaining of an itchy rash on her legs and breathing problems. (A.R. at 286). On this visit, she was diagnosed with dermatitis[1] and was given a prescription for budesonide.[2] (A.R. at 289). On April 1, 2010, Dumach went for a follow-up appointment. At this appointment, Dumach reported chronic fatigue, increased nausea without vomiting, increased constipation, persistent diarrhea, and problems sleeping. (A.R. at 317). On April 20, 2010, Dumach was seen by Dr. Ashraf A. Luqman and Dr. Lisa F. Wolfe, a pulmonary specialist, for proximal muscle weakness,[3] diffuse rash, and shortness of breath. (A.R. at 417-421). Dr. Luqman's history of illness notes a diagnosis in January 2010 of dermatomyositis.[4]

---

[1] Dermatitis is a general term that describes an inflammation of the skin. http://www.mayoclinic.org/diseases-conditions/dermatitis-eczema/basics/definition/con-20032183.
[2] Budesonide is used to help prevent the symptoms of asthma. http://www.mayoclinic.org/drugs-supplements/budesonide-inhalation-route/description/drg-20071233.
[3] Proximal muscle weakness means difficulty rising from chairs, getting out of the bathtub, climbing stairs, and/or shaving or combing the hair. http://emedicine.medscape.com/article/759487-overview.
[4] Dermatomyositis is an uncommon inflammatory disease marked by muscle weakness and a distinctive skin rash. http://www.mayoclinic.org/diseases-conditions/dermatomyositis/basics/definition/con-20020727.

(A.R. at 418). On April 27, 2010, Dumach saw dermatologist, Dr. Meyer Horn, for inflammation of the skin. (A.R. at 361).

On June 2, 2010, Dr. Hasam Khayal examined Dumach at the behest of the Social Security Administration. (A.R. at 387-90). Dr. Khayal had Dumach perform tests of seven physical activities, including getting on and off an exam table, squatting and arising, and hopping on one leg. (A.R. at 389). For each of the seven physical tests, Dr. Khayal reported "none" for degrees of difficulty in performance. (*Id.*) Dr. Khayal noted his diagnostic impression was "fatigue and shortness of breath…most likely associated with autoimmune disease…, history of Sjogren's disease,[5] hypertension,[6] and hypercholesterolemia.[7]" (*Id.*)

On June 17, 2010, Dumach underwent a Physical Residual Functional Capacity Assessment with agency physician Dr. Vidya Madala. (A.R. at 398-404). The assessment concluded that Dumach was limited, due to fatigue, to occasionally lifting 10 pounds, standing or walking two hours per workday, and sitting 6 hours per workday. (A.R. at 399). Dumach was limited to occasionally climbing stairs or ramps, balancing, stooping, kneeling, crouching, and crawling. (A.R. at 400). Dumach was not limited in any manipulative movements, in her visual capacity, her communicative abilities, or by her environment. (A.R. at 401-02).

On June 18, 2010, a blood test of Dumach indicated that she had an elevated white blood count. (A.R. at 406). According to Dr. Joan C. Mullan, Dumach's primary care physician, this "likely reflects the inflammatory state of the dermatomyositis." (*Id.*) Dr. Mullan also recommended a low fat and low cholesterol diet and exercise. (A.R. at 409).

---

[5] Sjogren's syndrome is a disorder of your immune system identified by its two most common symptoms — dry eyes and a dry mouth. http://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/basics/definition/con-20020275.
[6] High blood pressure. http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/definition/con-20019580.
[7] High cholesterol. http://www.hopkinsmedicine.org/heart_vascular_institute/conditions_treatments/conditions/high_cholesterol.html.

3

On June 24, 2010, Dumach was evaluated by Sandra Weintraub, Ph.D, a neuropsychologist at the Neurobehavior and Memory Health Service Northwestern Medical Faculty Foundation. (A.R. at 412-16). Dr. Weintraub reported Dumach's level of cognitive ability was "in the high average to superior range," her tests of attention and processing speed were "within the average range" and "at the expected level." (A.R. at 413). Also, "[t]here was no evidence for an accelerated of forgetting over time." (*Id*). Dumach, however, displayed significant difficulty shifting from one problem-solving activity to another. (*Id*).

On July 13, 2010, she met with dermatologist Dr. Meyer Horn to discuss the worsening of her skin condition. (A.R. at 471). Dumach met with Dr. Horn on August 15, 2010 (A.R. at 473-74), and November 15, 2010 (A.R. at 475-76), reporting improved condition on both visits. Dr. Horn amended his diagnosis to lupus on August 15, 2010. (A.R. at 473). On October 25, 2010, Dr. Wolfe also amended her diagnosis to cutaneous lupus,[8] and not dermatomyositis. (A.R. at 534).

On December 22, 2010, Dumach reported to rheumatologist Dr. Arthur Mandelin that her skin legions are no longer painful, but complained of bad abdominal cramps and diarrhea. (A.R. at 573). On February 24, 2011, Dr. Mandelin saw Dumach and reported "improved skin lesions" and "GI side effects from Rx seem to be abating over time." (A.R. at 616). On August 10, 2011, Dumach reported to Dr. Mandelin that new lesions had "really gotten [her] down" and that she was seeing a therapist to "better deal with this disease." (A.R. at 636).

On August 17, 2011, Dr. Mandelin completed a Physical Residual Functional Capacity Questionnaire, evaluating Dumach. (A.R. at 452-63). Dr. Mandelin listed Dumach's diagnosis as Cutaneous Lupus with a prognosis of "good" and her symptoms as "skin rash, pain, fatigue, [shortness of breath]." (A.R. at 452). Dr. Mandelin categorized Dumach's pain and other symptoms

---

[8] Cutaneous lupus erythematosus can be limited to the skin. "Cutaneous" means "skin." Symptoms may include rashes/lesions, hair loss, vasculitis (swelling of the blood vessels), ulcers, and photosensitivity. http://womenshealth.gov/publications/our-publications/fact-sheet/lupus.html.

4

as severe enough to interfere with her concentration and that Dumach is "[i]ncapable of even 'low stress' jobs" due to "pain and [shortness of breath]." (A.R. at 453). He concluded that, as a result of her impairments, Dumach could walk 3-4 city blocks without rest; sit for 1 hour at a time; stand for 15 minutes at a time; sit, stand, or walk for less than 2 hours in an 8 hour workday; that she needs a job where she can shift positions (sit/walk/stand) at will; take 2-3 one hour unscheduled breaks to lie down during an 8 hour workday. (A.R. at 459-60). He further opined that Dumach would have "good" days and "bad" days, requiring her absence from work more than 4 days per month. (A.R. at 462). Dumach never returned to work after her vertigo incident in December 2009 because she felt tired and was having a difficult time doing her job. (A.R. at 57-60).

B. *The October 31, 2011, Hearing before the ALJ*

On October 31, 2011, the ALJ held a hearing on the denial of disability benefits to Dumach following the finding that she is not disabled. Dumach testified at the hearing and was represented by counsel. Dumach testified to several primary areas of impairment: concentration, fatigue, prescription medication side-effects, and pain.

Dumach testified that she had a home-based market research consulting business since 1990 when she had an attack of acute vertigo in the middle of the night on December 15-16, 2009. Dumach explained that after the vertigo incident she felt really tired and that she began receiving criticism from her clients regarding her moderating and interviewing skills. (A.R. at 59). She further testified that she was having trouble concentrating and focusing on her work, and can only concentrate for about 15 or 20 minutes at a time on a bad day. (A.R. at 63). She testified that the medication she takes to treat the lupus, Prednisone, is very sleep disruptive and she does not like to take the sleep-aid Ativan because it is potentially addictive and causes her to be "foggy" for an hour or two after she wakes up. (A.R. at 62).

5

Dumach testified that she has a lot of problems with fatigue that can be overwhelming. (A.R. at 64). She must rest every day, sometimes for an hour or two each day. (*Id.*) Dumach testified that she can work for an hour to an hour and a half before taking a rest. (*Id.*) Dumach stated that she gets short of breath climbing stairs and limits her walking to a mile or so a day. (A.R. at 68)

Dumach testified that one of her medications, Cellcept, has gastrointestinal side effects, including diarrhea sometimes two or three times a day. (A.R. at 64). Her other prescriptions can cause irritability and mood swings. (A.R. at 66). Her immunosuppressant increases her risk of infection. (A.R. at 67). She had an incident where the medication for her skin lesions caused the skin on her foot to peel off and it became infected. (A.R. at 68). Dumach stated her skin problems began in October 2009 resulting in painful lesions, which was eventually diagnosed as lupus. Her skin lesions can be painful and she is sensitive to the touch of certain clothing. All of her ailments combined cause her to have numerous medical appointments, even as many as 19 in a three month period. (A.R. at 65).

*C. The ALJ's Findings*

In his written decision, (A.R. 34-44), Judge Brooks found that Dumach had the following severe impairments: hypertension, hyperlipidemia, dermatomyositis, subcutaneous lupus, sleep apnea, and obesity. (A.R. at 36). Despite Dumach's assertion of hearing loss and foot pain, the ALJ did not find those complaints severe. (*Id.* at 37). She was fitted for hearing aids, but never otherwise complained about her hearing. The ALJ found that although Dumach occasionally complained of pain and burning in her feet, tests were negative and her doctors could never determine the etiology of the foot pain. (*Id.* at 36-37).

Next, the ALJ found that Dumach does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. 404.1520(d), 404.1525, and 404.1526. (*Id.* at 37). The ALJ based his finding with respect to

Dumach's hypertension and hyperlipidemia on the fact that they have not caused any end-organ damage, and they have not affected a body system severely enough to meet the listed criteria. With respect to her dermatomyositis, the ALJ found that it does not meet the criteria in section 14.05 because there is no proximal muscle weakness, impaired swallowing, or impaired respiration. Additionally, Dumach has not had repeated manifestations of dermatomyositis that meet the criteria. The ALJ also found that her subcutaneous lupus does not meet the criteria of section 14.02 because two or more organs or body systems are not involved with at least a moderate level of severity and at least two constitutional symptoms. Nor were there repeated manifestations of lupus with at least two constitutional signs and a marked level of limitation of daily activities, social function, or deficiencies in concentration, persistence, or pace. Lastly, the ALJ found that Dumach's obesity does not meet or medically equal a listed impairment because Dumach does not have another impairment, which meets or medically equals a listed impairment. (*Id.*)

The ALJ concluded that Dumach has "the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a) except that she can never climb ropes, scaffolds, or ladders, and she can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl." (*Id.* at 37). Lastly, the ALJ found that Dumach is capable of performing past relevant work as a qualitative market researcher since this work does not conflict with Dumach's residual functional capacity. (*Id.* at 42). Alternatively, the ALJ concluded that Dumach is not disabled by direct application of the Medical-Vocational grid Rule 201.08.

**Legal Standard**

This Court affirms the Commissioner's finding if it is supported by substantial evidence and it is not the result of an error of law. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *Richardson v.*

7

*Perales*, 402 U.S. 389, 401 (1971)). Although this Court reviews the record as a whole, it cannot "substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Cass v. Shalala,* 8 F.3d 552, 555 (7th Cir. 1993). While the Court's review is deferential, it is not intended to be a rubber-stamp of the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). "The ALJ need not, however, provide a 'complete written evaluation of every piece of testimony and evidence.'" *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005) (quoting *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). The ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F. 3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004).

**Discussion**

Dumach makes three arguments for reversal of the ALJ's determination that she is not disabled. First, Dumach contends that the ALJ's determination that her testimony was not entirely credible is erroneous. Second, Dumach argues that the ALJ erred in rejecting the opinion of her treating rheumatologist, Dr. Mandelin. Lastly, she asserts that the ALJ's finding that her residual functional capacity still allows her to perform her relevant past work is erroneous and not supported by substantial evidence. The Commissioner argues that the ALJ's determination that Dumach is not disabled should be affirmed by this Court because it is supported by substantial evidence and the ALJ sufficiently explained his reasoning so as to build a "logical bridge" between the medical evidence and his conclusion.

8

A person is disabled under the Social Security Act if "she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(I). The Social Security Administration has set forth a five-step sequential evaluation process for determining whether an individual is disabled (20 C.F.R. 404.1520(a)). The process of evaluation is as follows: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see* 20 C.F.R. § 404.1520.

The ALJ found Dumach's subjective complaints of disabling pain and symptoms are not entirely credible. (A.R. at 41). In reaching this finding he stated his perceived disparity between Dumach's allegations of severity and the essentially routine and conservative medical treatment. (*Id.*). An ALJ's credibility finding will only be reversed if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Credibility determinations are entitled to special deference, *Powers,* 207 F.3d at 435, however, "the reasons for the credibility finding must be grounded in evidence and articulated in the determination or decision." *Jones v. Colvin*, No. 12 C 10070, 2014 WL 2458155, at *10 (N.D. Ill. May 30, 2014) (Mason, M.J.).

Here, the ALJ reviewed the medical evidence as it related to Dumach's testimony and allegations of pain and symptoms, explaining his reasons for discounting her credibility. The ALJ explained that, while Dumach's medications sometimes had side-effects, by 2011 they seemed to be under control, and her doctors never recommended more invasive treatment and noted the slow improvement of her condition. He specifically pointed to Dumach's shortness of breath as having

9

improved greatly with the use of inhalers, resulting in normal tests and chest scans. (A.R. at 41). The ALJ also found that Dumach did not consistently complain of the symptoms she claims prevent her from working. In particular, the ALJ noted that Dumach infrequently mentioned her confusion and mental symptoms with her rheumatologist and dermatologist, and discussed them only once with a neuropsychologist. (*Id.*). The ALJ also found that, although fatigue is one Dumach's main claims for being disabled, she did not consistently complain of fatigue nor did she frequently discuss it with her physicians. The ALJ discussed Dumach's description of her daily activities and found that further undermined her claims of disabling symptoms. (*Id.* at 42). The ALJ did not simply dismiss Dumach's claims, using only boiler-plate language to explain his reasons for finding her less than credible. Thus, the ALJ built a logical bridge between the evidence and his conclusions. *See Powers*, 207 F.3d 435-36 ("The discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition. For the hearing officer to rely on this as evidence of a lack of complete candor cannot be deemed patently wrong.").

Next, the Court considers whether the ALJ erred in rejecting the opinion of her treating rheumatologist, Dr. Mandelin. Dumach argues that the ALJ failed to provide sufficient reasons for rejecting Dr. Mandelin's opinion. This Court agrees. The ALJ concluded that Dr. Mandalin's opinion was inconsistent with his own treatment of Dumach and the other medical evidence of record, but he did not set forth any specific inconsistencies. (*See* A.R. at 42). When an ALJ declines to give controlling weight to a treating physician's opinion, he must explain his reasoning with reference to the following factors: "the length, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *see also* 20 C.F.R.

404.1527(c)(2). This Court therefore finds an insufficient explanation of the ALJ's rejection of Dr. Mandelin's opinion.

Despite this Court's finding that the ALJ failed to adequately support his conclusion that Dr. Mandelin's opinion warranted little weight, the Seventh Circuit instructs that this Court should not remand the matter if the same result would be reached on remand. "If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). A review of the medical record here supports a conclusion that the Commissioner would reach the same result on remand.

Here, Dr. Mandelin completed a Physical Residual Functional Capacity Questionnaire and a Lupus SLE Residual Functional Capacity Questionnaire in August 2011. He concluded that Dumach is able to walk three to four city blocks without rest, can sit for one hour at a time, only able to stand for 15 minutes at a time, and that she is able to sit, stand, or walk for less than two hours total in an eight-hour workday, that she needs to change positions from sitting to standing to walking at will and will need to two to three unscheduled one-hour breaks per day to lie down. (A.R. at 452-63). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see* 20 C.F.R. § 404.1527(d)(2).

Dr. Mandelin's opinion however is inconsistent with his own treatment notes, other medical evidence, and reflects a level of severity that does not appear in the medical record or accord with Dumach's own description of her daily activities. In his report, for example, he lists Dumach's symptoms as skin rash, pain, fatigue, and shortness of breath, and describes her prognosis as good. (A.R. at 452). He characterizes her pain as moderate and lists the side effects of from her

11

medications as insomnia, GI distress, peeling skin, and irritability. (*Id.*). He asserts pain and shortness of breath as the reason for his conclusion that Dumach is incapable of even low stress jobs. (*Id.*). Elsewhere in her records the tests indicate that her shortness of breath had been greatly improved with the use of an inhaler and when normal, she was taken off the inhaler. (*See* A.R. 417-429). The level of pain that Dr. Mandelin attributes to her skin lesions is not supported by or even mentioned in her dermatologist, Dr. Horn's progress notes. (*See* A.R. at 471-484). Dr. Horn notes no acute distress, no pain is recorded, he weens her off Prednisone as her condition improves and continues maintenance treatment with ointments. (*Id.*)

Further, Dumach claims fatigue and mental confusion as her primary disabling symptoms, but Dr. Mandelin's reasons for her inability to work are shortness of breath and pain. (*See* A.R. at 425, 459). Additionally, he makes no mention in his report of her problems with concentration and focus. Neuropsychologist Sandra Weintraub, Ph.D., on her sole examination of Dumach noted her test results indicated cognitive skills in the high average to superior range. Dr. Weintraub noted that the test findings in one area suggests a mild frontal network dysfunction and recommended follow-up testing and close monitoring by Dumach's primary care physician. (*See* A.R. at 413-414). In June 2010, consulting physician, Dr. Khayal, noted Dumach's complaints of fatigue and shortness of breath attributed to autoimmune disease. (A.R. at 390). All the tests Dr. Khayal conducted however were normal; Dumach had no difficulty with sitting, walking, crouching, hopping on one leg, and getting on or off the exam table. (*See* A.R. at 387-390). Dr. Joan Mullan, Dumach's primary care physician's progress notes from 2011, indicate improved conditions overall. (*See* A.R. at 497-509). Dr. Mullan's notes continually report no fatigue, normal lung sounds and breath, improved skin condition, and contain no mention or report of confusion or cognitive difficulties. (*Id.*). Based on the medical record from Dumach's treating physicians overall, Dr. Mandelin's assessment of the severity of her condition is unsupported and, indeed, contradicted by the medical record.

Accordingly, this Court finds that the Commissioner would reach the same result on remand because the original decision of the ALJ is overwhelmingly supported by the record.

Lastly, Dumach argues that the ALJ erred by finding that her residual functional capacity still allows her to perform her relevant past work is erroneous. For the reasons noted above, the ALJ declined to give controlling weight to Dr. Mandelin's Residual Functional Capacity findings and instead relied on agency physician Dr. Madala's assessment that Dumach is able to perform skilled sedentary work. (A.R. at 42). Dumach previously worked as a qualitative market researcher. She testified that the position required her to offer customized qualitative market research consulting to businesses by using market research, writing proposals, project execution, outlining material, and collecting data. (*Id.*) Dumach stated that she was required to walk eight hours per day, stand one hour per day, sit six hours per day, but never climb or handle large objects. She worked from home sixty-five percent of the time and spent the remaining thirty-five percent of the time interviewing people. (*Id.*). The ALJ found this position in the Dictionary of Occupational Titles (DOT), 050.067-014, as qualitative market researcher, which is defined as skilled sedentary work. The ALJ found that Dumach is able to perform this skilled sedentary job as it is generally performed by comparing her residual functional capacity with the physical and mental demands of the position of qualitative market researcher. (*Id.*).

This Court does not find that the ALJ made any legal error. Although he did not enumerate the job requirements of a qualitative market researcher in the DOT, he discussed in detail Dumach's previous relevant work as she described it and concluded that a comparison indicates that she is able to perform this skilled sedentary job of qualitative market researcher. (*Id.*). An ability to perform her previous job disqualifies Dumach from receiving disability insurance benefits, even though she is unemployed and claims a severe disability. *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991).

The ALJ alternatively found Dumach not disabled based on a direct application of Rule 201.08 of the Medical Vocational Grid Rules would direct a conclusion of "not disabled." (A.R. at 43). "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Pt. 404, Subpt. P, App. 2 §200.00(a); *see Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005). Application of the grid rule here when considering Dumach's age, education, non-transferable job skills, and ability to perform sedentary work coincide with rule 201.08, concluding that Dumach is not disabled. This Court finds no error with the ALJ's application of the grid rule.

**Conclusion**

Based on the forgoing, this Court denies Dumach's motion for summary judgment and affirms the decision of the Commissioner.

IT IS SO ORDERED.

Date: January 15, 2016

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge